**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MORGAN DUNCAN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br>v.<br><br>HOMESPUN GLOBAL, LLC,<br><br>Defendant. | Case No. ____________<br><br>**CLASS ACTION COMPLAINT**<br><br>**(DEMAND FOR JURY TRIAL)** |

Plaintiff Morgan Duncan, individually and on behalf of all others similarly situated, makes the following allegations against Defendant Homespun Global, LLC pursuant to the investigation of her counsel and based upon information and belief, except as to allegations pertaining specifically to herself or her counsel, which are based on personal knowledge.

## NATURE OF THE CASE

1. Plaintiff brings this action against Defendant Homespun Global, LLC ("Defendant" or "Homespun") to redress and put a stop to the false, deceptive, and unlawful manner in which Defendant has manufactured, labeled, advertised, promoted, and marketed its "Lane Linen"-branded bedding and linen products to consumers. On the labeling and packaging, and in advertising and promotional materials for many of its "Lane Linen" and "Casa Platino"-branded bedding and linen products, Defendant has represented that such products have thread counts of 1000 and greater (collectively, the "Subject Products").

2. Bedding and linen products that contain higher thread counts typically cost more to manufacture than their lower thread-count counterparts, largely due to the finer, stronger yarns and precision required to produce them. Many consumers, however, demand and are willing to pay premium prices for these higher thread-count bedding and linen products because they reasonably associate such products as having greater quality, durability, longevity, and softness. Additionally,

higher thread-count bedding and linen products are generally more resistant to wear and tear, making them longer-lasting investments than lower thread-count alternatives. As a result, bedding and linen products with high thread counts are typically priced higher than products with lower thread counts.

3. Consumers rely on thread-count representations on the labeling and packaging of, and in advertising, promotional, and marketing materials for, bedding and linen products as they assess, compare, and ultimately purchase these products. For example, a consumer who is considering a bedding or linen product represented to contain an 800 thread count will naturally believe that such a product is of superior quality, durability, longevity, and softness—and worth paying more money to purchase—than an alternative product represented to contain a 500 thread count.

4. Plaintiff and members of the putative Classes (defined below) purchased the Subject Products based on Defendant's representations that they contained thread counts of at least 1000. Unbeknownst to them, however, the Subject Products actually contain thread counts of approximately 40% less than what Defendant represents—as independent laboratory testing commissioned by Plaintiff's counsel has revealed.

5. For instance, with respect to the Subject Products that are represented as containing thread counts of 1000 or greater, laboratory testing has revealed that these products actually contain a thread count of only 474. At a thread count of 474, these Subject Products provide far less durability, longevity, softness, and sleep-ability—and are of significantly lower quality and worth far less money—than bedding and linen products that contain thread counts of 1000 or greater.

6. Defendant has manufactured, labeled, advertised, promoted, and marketed the Subject Products as having higher thread counts than they actually have to capitalize on consumer demand for superior bedding and linen products—which it can sell at premium prices. By promising thread counts of at least 1000, the Subject Products sell at premium prices, generating more revenue and profit for the Defendant than their lower-thread-count alternatives.

7. By falsely representing the thread counts of the Subject Products, Defendant has misled and continues to mislead consumers into believing that they are purchasing bedding and linen products of higher quality, durability, longevity, softness, and sleep-ability than the lower-thread-count bedding and linen products that they actually receive, thereby deceiving them into paying a premium price for non-premium products.

8. Defendant's practices of falsely, deceptively, and misleadingly representing the Subject Products (including on the products' labeling and packaging and in advertising and promotional materials) induced Plaintiff and numerous other consumers either to purchase products they would otherwise not have purchased at all, or to pay significantly more money for them than if they had been manufactured, labeled, packaged, advertised and promoted with accurate thread count representations.

9. Accordingly, on behalf of themselves and the members of the Classes (defined below), Plaintiff brings this Class Action Complaint against Defendant to redress and put a stop to its practices of falsely, deceptively, and unlawfully misrepresenting the thread counts of the Subject Products—conduct that has caused significant harm to numerous consumers nationwide, including in Oklahoma and New Jersey. Plaintiff seeks actual damages, restitution, injunctive relief, punitive damages, and other legal and equitable remedies on behalf of herself and others similarly situated.

## PARTIES

### I. Plaintiff

10. Plaintiff Morgan Duncan is, and at all times relevant hereto was, a citizen and resident of Tulsa County, Oklahoma.

11. In or about July 2024, from her home in Oklahoma, Plaintiff purchased a Lane Linen-Branded Bedding Product that was manufactured, labeled, packaged, promoted, and advertised as containing a "1000 Thread Count" from the Amazon.com online website for $104.99.

12. The Lane Linen-Branded Bedding Product that Plaintiff purchased was manufactured, labeled, packaged, advertised, and promoted by Defendant.

13. Thread count was one of the most important considerations, if not the most important consideration, in Plaintiff's decision to purchase the Lane Linen-Branded Bedding Product. Plaintiff values the higher quality, including greater durability, longevity, and comfort, that higher thread-count bedding and linen products offer.

14. Prior to purchasing the Lane Linen-Branded Bedding Product, Plaintiff saw—and in making her decision to purchase, relied upon—Defendant's representations (appearing on the product's labeling, packaging, and advertisements) that this product contained a "1000 Thread Count".

15. After purchasing and receiving the Lane Linen-Branded Bedding Product in the mail, Plaintiff immediately started using the product.

16. Based on Defendant's representations in its advertising and on the product labeling, Plaintiff expected the Lane Linen-Branded Bedding Product that she purchased to have 1000-thread-count quality, including in terms of softness and sleep-ability, and to otherwise be of high quality. But the product was not as advertised, and Plaintiff quickly found the product to be neither

of the quality nor softness that she expected (or that any reasonable consumer would expect) from 1000-thread-count sheets. Consequently, Plaintiff later discontinued her use of the Lane Linen-Branded Bedding Product.

17. On November 20, 2024, testing commissioned by Plaintiff's counsel was performed on a Lane Linen-Branded Bedding Product, which Plaintiff's counsel had purchased, by a reputable, qualified laboratory. The testing revealed that the fabric used in this line of products includes threads made of filing yarn in a continuous filament with a thread count of 474 threads per inch. To comply with the industry's ±5% maximum deviation allowance, products advertised and marketed as 1000 thread count must have an actual thread count between 950 and 1050. *See infra* at ¶ 46. At a thread count of 474, Defendant's Lane Linen-Branded Product falls well below the acceptable and reasonable thread count range for a product represented to contain a 1000 thread count.

18. Like the product that Plaintiff's counsel purchased and had tested by a qualified, reputable laboratory, the product purchased by Plaintiff also contains approximately 474 threads per inch—well below what is acceptable or reasonable by industry standards for "1000 thread count" sheets.

19. Had Plaintiff known of the Lane Linen-Branded Bedding Product's actual thread count—which is materially less than the labeled and advertised thread count of 1000— Plaintiff would either not have purchased the product at all or would have only purchased it at a significantly lower price.

20. The product Plaintiff received (a Lane Linen-Branded Bedding Product containing less than 50% of the advertised thread count) is of significantly lower quality and worth far less

money than the product Defendant represented on its labeling, packaging, and advertisements (a Lane Linen-Branded Bedding Product containing a 1000-thread count).

21. As a direct result of Defendant's false, deceptive, and misleading statements and omissions concerning the Subject Products' thread counts, Plaintiff suffered economic injury by paying a premium for an inferior quality good and by being deprived of the full intended use of her product and the full benefit of the bargain promised by Defendant. Plaintiff has been damaged in an amount to be proven at trial.

22. Plaintiff would likely purchase bedding or linen products manufactured and labeled, packaged, advertised, and promoted by Defendant in the future if the thread counts represented by Defendant on the labeling and packaging of such products (and in advertising and promotional materials for such products) were accurate and truthful—information which would allow her to make an informed decision in selecting bedding or linen products for different purposes and at different price points.

**II. Defendant**

23. Defendant is a New Jersey company that maintains its headquarters and principal place of business at 4000 Bordentown Avenue, Suite 18, Sayreville, NJ, 08871.

24. Defendant manufactures, labels, packages, advertises, promotes, and markets bedding and linen products, including the Subject Products, under several internationally recognized designer brand names, including Lane Linen and Casa Platino.

25. Defendant's products, including the Subject Products, are sold to consumers nationwide (including in Oklahoma and New Jersey) at various online storefronts (including Walmart.com and Amazon.com).

## JURISDICTION AND VENUE

26. The Court has subject-matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because (i) there are more than 100 members of each of the putative Classes, (ii) the aggregate amount in controversy for each of the Classes exceeds $5,000,000, exclusive of interest and costs, and (iii) at least one member of each of the Classes is a citizen of a state different from Defendant.

27. Personal jurisdiction and venue are proper because Defendant maintains its headquarters and principal place of business in Sayreville, New Jersey, within this judicial District.

## BACKGROUND

### I. Statutory Landscape

28. In 1914, the Federal Trade Commission ("FTC") was created "to prevent persons, partnerships, or corporations . . . from using unfair methods of competition in commerce." *See* Federal Trade Commission Act, Sept. 26, 1914, 38 Stat. 717 (1914). And by passing the Wool Products Labeling Act of 1939 ("Wool Act"), 15 U.S.C. § 68, *et seq.*,[1] and the Textile Fiber Products Identification Act of 1958 ("Textile Act"), Pub. L. 85-897, 72 Stat. 1717 (September 2, 1958), Congress tasked the FTC, at least in part, with creating and enforcing appropriate standards for the marketing, labeling, and sale of textiles and wool.[2]

29. Soon thereafter, the labels of and advertisements for textiles began to include, *inter alia*, thread count figures.

30. In 1979, to address widespread confusion over the appropriate method of calculating and interpreting a textile's thread count, by consumers and industry alike, the American Society for Testing and Materials ("ASTM"), an international standards organization that develops

---

1 *See* Pub. L. No. 98–417, §§ 304–05, 98 Stat. 1585, 1604 (current version at 15 U.S.C. § 68b(a)(2)(D)).
2 *See* Pub. L. No. 85–897, § 4, 72 Stat. 1717, 1719 (1958) (current version at 15 U.S.C. § 70b(b)(4)-(5).

and publishes voluntary consensus technical standards for a wide range of materials, products, systems, and services, implemented the "Standard Test Method for Warp (End) and Filling (Pick) Count of Woven Fabrics," also known as "Standard 3775." *See* ASTM D3775.[3]

31. Determining a textile's thread count under ASTM Standard 3775 is as simple as "[c]ount[ing] the number of ends and picks in five randomly spaced places diagonally across the width of the laboratory sampling unit" and "count[ing] each yarn separately, as a single unit, regardless of whether it is comprised of single or plied components."[4] *See id.*

32. Under ASTM Standard 3775, a textile's thread count is accurately represented if it falls within 5% of the value calculated using the method specified in the preceding paragraph. *See* ASTM D3775.

33. On March 8, 1984, the FTC announced that "industry members should, where possible, use procedures established by the American Society for Testing and Materials (ASTM)" in a related context. *See* Press Release, FTC Announces Actions on Wool Labeling Rules, attached hereto as **Exhibit A**.

---

[3] While ASTM 3775 has undergone several amendments since 1979, the standard protocol for calculating thread count has not changed.

[4] The words "count," "end," "filling," "pick," "pick count," "warp," and "yarn" are terms of art defined by the ASTM accordingly:

> ***count***, n—in woven textiles, the number of warp yarns (ends) and filling yarns (picks) per unit distance as counted while the fabric is held under zero tension, and is free of folds and wrinkles
> ***end***, n—in fabric, an individual warp yarn (single or ply) or cord.
> ***filling***, n—yarn running from selvage to selvage at right angles to the warp in a woven fabric
> ***pick***, n—an individual filling yarn.
> ***pick count***, n—in woven fabrics, the number of filling yarns per unit fabric length.
> ***warp***, n—(1) the yarn running lengthwise in a woven fabric (2) a group of yarns in long lengths and approximately parallel, put on beams or warp reels for further textile processing including weaving, knitting, twisting, dyeing, etc
> ***yarn***, n—a generic term for a continuous strand of textile fibers, filaments, or material in a form suitable for knitting, weaving, or otherwise intertwining to form a textile fabric.

*See* ASTM D 123-03, Standard Terminology Relating to Textiles.

34. Over the following decades, manufacturers and sellers of consumer textiles have adopted and adhered to the ASTM method, making it the widely accepted industry standard of counting each yarn as one thread, regardless of whether the yarn was a single-ply or multi-ply yarn.

35. Despite these clear guideposts for determining thread count, in 1997, the American Textile Manufacturers Institute ("ATMI") warned the FTC that several companies were deceptively marketing textiles as containing inflated thread count figures for consumers. *See* Letter from ATMI's Executive Vice President to the FTC, attached hereto as **Exhibit B**.

36. On January 31, 2002, ATMI renewed these concerns and requested an advisory opinion from the FTC declaring ASTM D3775 as the standard method to determine a textile's thread count. *See id.*

37. On March 18, 2002, the FTC responded to ATMI's request for an advisory staff opinion by stating, in pertinent part:

> A thread count claim, like other objective, material claims about a product, must be supported by a "reasonable basis." In determining what constitutes a reasonable basis for claims, we would consider what experts in the field believe is appropriate, including whether there are relevant consensus based test procedures, such as an ASTM test procedure, or other widely accepted industry practices that apply to the matter. If so, we would give such procedures or practices great weight in determining whether: the advertiser has met its substantiation burden.

*See* FTC Letter to ATMI's Executive Vice President, attached hereto as **Exhibit C**.

38. On May 23, 2005, the National Textile Association, the largest trade association (over 100 companies) representing the U.S. textile industry and suppliers, wrote to the FTC to request a staff opinion concerning the appropriate "method for determining thread count in textile bedding products." *See* Letter to the FTC from the National Textile Association, attached hereto as **Exhibit D**.

39. The National Textile Association explained in its letter to the FTC that:

> The thread count (number of threads per square inch of fabric) is an important indicator of fabric quality for consumers who purchase textile bedding products such as bed sheets. Thread count has evolved over time as a key indicator used by consumers to make purchasing decisions. Generally, it is perceived that the higher the thread count, the better the end product.

*See id.* The National Textile Association further explained in its letter that:

> The ***common practice in the U.S. textile bedding industry for decades*** has been to count the number of threads in both the warp and filling directions. Yarns were counted as one yarn, regardless of whether the yam was a single ply or multi-ply yam. (A multi-ply yam is one yarn that has been created by twisting two or more yams together.) In recent years, however, some textile bedding suppliers have changed the way they have determined thread count by counting plied yams individually. ***This practice inflates the thread count*** numbers to levels which double or triple (or more) the thread count as determined by the long standing, traditional way. ***This practice has also created confusion in the marketplace and has caused consumers to compare thread counts that may have been calculated in two dramatically different ways***.

*See id.* (emphasis added).

40. On August 2, 2005, the FTC responded to the National Textile Association advising that representations about thread count must be supported by a "reasonable basis" and that:

> Based upon the ASTM standard, as well as the information you have provided about standard industry practices with regard to disclosing thread count, ***we believe that consumers could be deceived or misled by the practice of stating an inflated thread count***, achieved by multiplying the actual count by the number of plies within the yarn. A possible non-deceptive way to disclose both the thread count and the yarn ply would be to state, for example: "300 thread count, 2 ply yarn." A representation of "600 thread count" for this same product would likely mislead consumers about the quality of the product being purchased.

*See* FTC Letter to the National Textile Association, attached hereto as **Exhibit E** (emphasis added).

41. Thus, according to the ASTM international standards, common industry standard, and FTC guidance, "thread count" appropriately refers to the sum "of the number of warp yarns (ends) and filling yarns (picks) per unit distance as counted while the fabric is held under zero

tension and is free of folds and wrinkles, individual warp and filling yarns are counted as single units regardless of whether comprised of single or plied components." *See* ASTM D3775.

42. The FTC's prior, consistent determinations that found that consumers are likely to be deceived or misled by inflated thread count figures continue to ring true today—Defendant's practices at issue in the present case of falsely and deceptively misrepresenting the thread counts of the Subject Products in direct contravention of ASTM D3775, conduct which illustrates this deception and has caused significant harm to numerous consumers nationwide, including in Oklahoma and New Jersey.

## II. Consumers Perceive Higher Thread Count Bedding and Linen Products as High Quality Products that Justify Higher Prices to Purchase

43. Consumers use thread count as an indicator to gauge and assess the fabric quality, durability, and longevity of bedding and linen products.

44. Consumers perceive higher thread-count bedding and linen products as being of higher quality, durability, longevity, softness, and sleep-ability and, in turn, have come to understand that "the higher a sheet's thread count," "the higher the price" the sheet will cost.[5]

## III. Defendant Misrepresents the Thread Counts, and thus the Quality, of its Bedding and Linen Products to Consumers

45. Defendant's representations concerning the Subject Products' thread counts are false, deceptive, and misleading.

---

[5] *See* Marilyn Bethany, *When Shopping for a Down Comforter*, N.Y. TIMES (Nov. 26, 1987), https://www.nytimes.com/1987/11/26/garden/when-shopping-for-a-down-comforter.html. ("Tighter weaves, measured by thread count or the number of threads per square inch, will also likely wear better."); Jackie Reeve, *What Is a Good Thread Count for Sheets?,* N.Y. TIMES (updated Feb. 11, 2020), available at https://www.nytimes.com/wirecutter/blog/good-thread-count-for-sheets/; Lucy Alexander, *Silk Sheets: The Hugh Hefner Look is Back*, THE TIMES (Apr. 16, 2010), https://www.thetimes.com/article/silk-sheets-the-hugh-hefner-look-is-back-nvgm8cfdtvg ("The latest obsession is with thread count and Egyptian cotton. Five years ago, no-one outside the bed linen department at the Ritz knew what these words meant, yet sales of high-thread count bed linen at John Lewis rose 70 per cent in the year to March. 'A year ago we had 400 thread count pima, which is like Egyptian cotton but made from a longer staple,' Fiona Caulfield, bed linen buyer at John Lewis, says. 'Now we have added pima 800, and I can't keep it on the shelves.'").

46. This is because the Subject Products do not contain thread counts of 1000 or greater, as Defendant represents on the labeling and in advertising and promotional materials for the Subject Products. In reality, the Subject Products' thread counts are approximately 50% lower than Defendant represented.

47. On or about October 29, 2024, Plaintiff's counsel purchased a Lane Linen-Branded Bedding Product for $84.99 plus tax from Amazon's online website, www.amazon.com. The product purchased by Plaintiff's counsel was advertised as being "1000 Thread Count" and "Luxury Sheets."

48. Plaintiff's counsel then submitted the purchased product to a reputable and qualified laboratory for testing. The lab tested the Lane Linen-Branded Bedding Product pursuant to ASTM D3775. Testing concluded on November 20, 2024.

49. The results of the testing commissioned by Plaintiff's counsel reveal that the Lane Linen-Branded Bedding Product does not contain a thread count of 1000, but instead contains a thread count of 474. *See* **Exhibit F** ("ISO/IEC 17025 Third Party Test Report" of the Lane Linen-Branded Bedding Product by Vartest Laboratories, dated November 20, 2024). The lab's test results were derived from the testing methods and procedures embodied in ASTM D3775. *See id.*

50. The Subject Product that Plaintiff purchased, like the Subject Products purchased by each member of the Classes during the relevant time period, contained the same or substantially the same thread counts as the Subject Product that was subjected to the laboratory testing commissioned by Plaintiff's counsel, as described above. During the time period relevant to this action, all of the Subject Products sold to consumers in the United States were produced and manufactured by Defendant in the same or substantially the same manner and labeled and packaged by Defendant with the same or substantially the same packaging and labeling, on which

the same thread count figures uniformly appeared. Moreover, there were no reported recalls, manufacturing issues, or other events concerning the Subject Products to suggest that any of the Subject Products might contain different thread counts than any other Subject Products. Accordingly, all of the Subject Products manufactured, labeled, and packaged by Defendant and purchased by consumers during the time period relevant to this action contained the same or materially the same thread counts—all approximately 50% less than represented.

51. The "Casa Platino"-branded bedding and linen products that Defendant manufactures, labels, packages, advertises, and promotes are like the Lane Linen-Branded Bedding Products described above, because they are labeled, advertised, and promoted by Defendant with the same or materially the same misrepresentations concerning the thread counts of such products —namely, that they, like the Lane Linen-Branded Bedding Products described above, have thread counts materially less (by approximately 50%) than what is represented.

52. The Subject Product that Plaintiff purchased, like all of the Subject Products purchased by members of the Classes during the time period relevant to this action, are all substantially similar in that they were all manufactured, labeled, packaged, advertised and promoted by Defendant in the same manner and all bear the same inflated thread count representations on their packaging and labeling and in materials advertising and promoting them.

53. As mentioned above, the Subject Products are sold to consumers through various online storefronts, including Amazon.com and Walmart.com, examples of which are below:

a) **Amazon.com**: Defendant's Lane Linen-Branded Bedding Products are sold to consumers on Amazon.com with specific thread counts represented in the name of the

products and their listing, *see* Figure 1 below, on the label of the products, *see* Figure 2 below, and in the product descriptions, *see* Figure 3 below: [6]




(Figure 1)




(Figure 2)

[6] Defendant's Casa-Platino Branded Bedding Products are similarly misrepresented on Amazon.com. *See* https://www.amazon.com/Thread-Sateen-Premium-Quality-Egyptian/dp/B0876DYMC8?th=1

**About this item**

- 100% Egyptian Cotton
- Luxurious Feel: Indulge in unparalleled comfort with these 1000 Thread Count 100% Egyptian cotton queen size bed sheets set, specially designed for a queen size bed. These deep sheets queen size features high thread count to ensure a silky-smooth texture, makes them the perfect queen size fitted sheets cotton soft feel for a luxurious night's sleep.
- Perfect Fit for Queen Size Bed: These sheet set includes generously sized queen size sheets satin, 1 fitted taupe queen sheets deep pockets and fully elasticized edges: 61" x 81" + 16" ensuring a snug and secure fit on queen size mattresses, 1 flat sheet: 94" x 104" and 2 queen size egyptian cotton pillowcases: 20" x 30", maqueen them the perfect queen size bed sheets set.
- Breathable and Cool Bed Sheets: Enjoy better airflow and temperature regulation throughout the night with these deep pockets queen sheets. These 100 cotton sheets queen size set come in a range of classic colors, to effortlessly complement any bedroom decor. With a focus on comfort and aesthetics, they add a touch of sophistication to your queen-size bed.
- Silky Soft and Durable: Crafted from 100% Egyptian cotton, these taupe sheets queen size for queen size beds offer exceptional softness and durability. To ensure the luxurious quality reminiscent of high-end hotel sheets, we've utilized a two-ply yarn method to achieve a sumptuous thread count of 1000. Please note, there may be a slight variance of up to +/- 5% in the thread count due to manufacturing process limitations.
- Easy Care: Machine wash these 100% egyptian cotton queen size sheets set for queen size bed in cold water with a gentle cycle using a mild detergent, and tumble dry on low heat or delicate setting to maintain their softness and quality. All our sheet & pillowcase sets is proudly OEKO-TEX certified and comes packed in reusable cotton bags, showcasing our commitment to both quality and sustainability.

(Figure 3)

b) **Walmart.com**: Defendant's Lane Linen-branded bedding products sold on Walmart.com included inflated thread counts in the product names and their listings (*see* Figure 4 below) and in the product descriptions (*see* Figure 5 below). [7]

[7] During the relevant time period, Defendant's Casa Platino-Branded Bedding Products sold on Walmart.com included the inflated thread count in the name of the products and their listing and descriptions, but these characteristics changed prior to the filing of this Action. An examination of the Casa Platino-Branded Bedding Product's URL and its associated reviews reveals that the title previously contained "1000 thread count" and Defendant's labeling of that product contained the "1000 thread count" representation. *See*




(Figure 4)

---

https://www.walmart.com/reviews/product/1665671570 ("Surprisingly for a 1000 thread count these are extremely scratchy. came out very wrinkly from dryer and very like 1000 razor blades on my legs.").

**Specifications**

| | |
|---|---|
| **Pillowcase size** | Queen |
| **Features** | Breathable |
| **Pocket depth** | 16 in |
| **Bed sheet type** | Sheet Sets |
| **Color type** | White |
| **Thread count** | 1000 |
| **Items included** | 1 white fitted sheet queen size with fully elasticized edges & deep pockets: 61" x 81" + 16", 1 white flat sheet queen size : 94" x 104" and 2 pillow covers queen size: 20" x 30" |
| **Bed size** | Queen |
| **Fabric care instructions** | Machine wash in cold water with a gentle cycle using a mild detergent, and tumble dry on low heat or delicate setting |
| **Fabric material percentage** | 100 |
| **Weaving technique** | Sateen |

(Figure 5)

54. As further shown in Figure 1 above, some online locations where the Subject Products are sold, including Amazon, track the number of sales made for the Subject Products monthly and display that number for purchasers and consumers to see.

55. Defendant, as the producer, manufacturer, and labeler of the Subject Products, has been aware or should have been aware, since the products' inception, that the Subject Products' actual thread counts are significantly lower than what Defendant represented.

56. Defendant intentionally and willfully made false, deceptive, and misleading representations concerning the thread counts of the Subject Products on the packaging and labeling

of, and in advertisements and promotional materials for, the Subject Products—for the purposes of inducing consumers to purchase the Subject Products and maximizing sales of the Subject Products, thereby generating more revenues and increased profits for itself.

57. Plaintiff is just one of many consumers nationwide who has been deceived by Defendant's false and misleading thread-count representations of the Subject Products, as the following examples of publicly available "reviews" of the Subject Products reflect:[8]




58. At all times relevant hereto, Defendant knew or should have known that its method of calculating the thread counts of the Subject Products—to the extent any such method was used at all—was yielding inaccurate, false, deceptive, and/or misleading figures that were not calculated in accordance with the ASTM industry standards or relevant FTC guidelines.

59. By falsely, misleadingly, and deceptively advertising and labeling the Subject Products—far in excess of the thread counts that these products actually contained (as calculated pursuant to ASTM industry standards and relevant FTC guidelines)—Defendant wrongfully and

---

[8] These reviews are accessible at the following webpage: https://www.walmart.com/reviews/product/1665671570.

unlawfully induced Plaintiff and the other members of the Classes to purchase products that they would not have purchased (or would only have purchased at significantly lower prices) had they known the actual thread counts of such products at the time of purchase.

60. Many of Defendant's competitors accurately and truthfully advertise and label their bedding and linen products with accurate thread counts pursuant to ASTM industry standards and relevant FTC guidelines, so Defendant could and should have done so as well. Instead, Defendant intentionally chose to manufacture, label, package, advertise, and promote the Subject Products with false and misleading representations concerning the thread counts of such products.

61. Defendant's misrepresentations of the Subject Products' thread counts, on the labeling of and in advertising and promotional materials for such products, were made for the purpose of inducing—and did in fact induce—consumers (including Plaintiff and members of the Classes) to purchase the Subject Products at premium prices, based on their reasonable but mistaken beliefs that the Subject Products were of higher quality, durability, longevity, softness, and sleep-ability than lower-thread-count alternatives.

## CLASS ACTION ALLEGATIONS

62. Pursuant to Federal Rule of Civil Procedure 23, Plaintiff seeks to represent the following "Nationwide Class":

> All persons in the United States who, during the relevant period preceding the filing of this action, purchased any of the Subject Products.

63. Plaintiff additionally seeks to represent the following "Oklahoma Subclass" pursuant to Federal Rule of Civil Procedure 23:

> All persons who, during the three years preceding the filing of this action, purchased any of the Subject Products in Oklahoma.

64. The "Nationwide Class" and the "Oklahoma Subclass" are at times referred to

herein collectively as the "Classes".

65. Plaintiff reserves the right to modify the definitions of the Classes, and/or add additional classes or subclasses, following the commencement of discovery and further investigation.

66. Excluded from the Classes are Defendant, any parent, subsidiary, affiliate, or controlled person of Defendant, as well as the officers, directors, agents, servants, or employees of Defendant.

67. The Classes are so numerous that their individual joinder herein is impracticable. The number of persons within the Classes is substantial. Plaintiff is informed and believes, and thereupon alleges, that there are at least tens of thousands of persons who comprise the Nationwide Class and at least thousands of persons who comprise the Oklahoma Subclass. The precise number of members within the Classes and their identities are unknown to Plaintiff at this time but may be determined through discovery. Members of the Classes may be notified of the pendency of this action by mail and/or publication through the purchase records of Defendant and relevant third parties.

68. Common questions of law and fact exist for all members of the Classes and predominate over questions affecting only individual members. Common legal and factual questions include but are not limited to: (a) whether Defendant's representations concerning the Subject Products' thread counts were false, deceptive, and/or misleading; (b) whether Defendant knew or should have known that its misrepresentations, as alleged herein, were false or misleading to consumers; (c) whether reasonable consumers would rely on Defendant's misrepresentations concerning the thread counts of the Subject Products, as alleged herein, and reasonably believe that the Subject Products were of the quality and condition advertised; (d) whether Defendant

designed the labeling, packaging, advertising and promotional materials for the Subject Products, and received and retained profits attributable to sales of the Subject Products, in New Jersey; (e) whether Defendant's conduct, as alleged herein, violated the statutes and laws at issue; and (f) the damages to which Plaintiff and the Classes are entitled to redress Defendant's unlawful conduct, as alleged herein.

69. The named Plaintiff's claims are typical of the claims of the unnamed members of the Classes in that the named Plaintiff and all members of the Classes suffered similar injuries as a result of the same, uniform conduct and practices of Defendant, as alleged herein.

70. Plaintiff is an adequate representative of the Classes she seeks to represent because her interests are aligned, and do not conflict, with the interests of the other members of the Classes, she has retained competent counsel experienced in prosecuting consumer class actions, and they intend to prosecute this action vigorously. Plaintiff and her counsel will fairly and adequately protect the interests of the Classes.

71. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Classes is impracticable. The interest of an individual member of the Classes in controlling the prosecution of his or her separate claim is small because the damages at stake for each individual's claim are small. Even if every member of the Classes could afford to pursue individual litigation, the Court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, the maintenance of this action as a class action, with respect to some or all of

the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system, and protects the rights of each member of the Classes. Plaintiff anticipates no difficulty in the management of this action as a class action.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Unjust Enrichment
### (By Plaintiff, Individually and on Behalf of the Nationwide Class, Against Defendant)

72. Plaintiff repeats and incorporates the paragraphs above as though fully set forth herein.

73. Plaintiff brings this claim individually and on behalf of the Nationwide Class against Defendant under New Jersey common law.

74. Plaintiff and the Nationwide Class members have conferred substantial benefits on Defendant by purchasing the Subject Products, including the monetary profits that Defendant received attributable to sales of the Subject Products to Plaintiff and members of the Nationwide Class.

75. Defendant received and retained, at its corporate headquarters in New Jersey, the monetary profits that it received attributable to sales of the Subject Products to Plaintiff and members of the Nationwide Class. Defendant appreciates or has knowledge of such benefits, which it received in New Jersey and retains in New Jersey.

76. Defendant has knowingly and willingly accepted and enjoyed these benefits in New Jersey.

77. Defendant developed, designed, and implemented the deceptively labeled and advertised Subject Products from and within its headquarters in New Jersey.

78. Defendant either knew or should have known that the payments rendered by Plaintiff and the Nationwide Class members were given and received with the expectation that the Subject Products would be as represented and warranted. For Defendant to retain the benefit of Plaintiff's and Nationwide Class members' payments under the circumstances alleged above is inequitable.

79. As a result of the deliberate misrepresentations Defendant made on the labeling and packaging of the Subject Products, and in advertising and promotional materials for the Subject Products, that the Subject Products contained thread counts of 1000 or greater—representations Defendant made from its headquarters in New Jersey, on product labeling and packaging and in advertising and promotional materials for the Subject Products that Defendant conceived of and designed from its headquarters in New Jersey—Defendant wrongfully received and retained, in New Jersey (including at bank accounts maintained in New Jersey), monetary revenue and profits attributable to sales of the Subject Products.

80. As described above, had Plaintiff been aware of the actual thread counts of the Subject Products, she either would not have paid as much as she did for the Subject Products or she would not have purchased the Subject Products at all.

81. As a direct and proximate result of Defendant's wrongful conduct and unjust enrichment, Plaintiff and the other Nationwide Class members have suffered actual damages, in the form of the value that Plaintiff and the other Nationwide Class members paid for and ascribed to bedding and linen products that contain thread counts of 1000 or greater, which is what Defendant falsely represented the Subject Products as providing.

82. Equity demands disgorgement of Defendant's ill-begotten gains. Defendant will be unjustly enriched unless it is ordered to disgorge those profits for the benefit of Plaintiff and Nationwide Class members.

83. Plaintiff and the Nationwide Class members are entitled to restitution from Defendant and institution of a constructive trust disgorging all profits, benefits, and other compensation obtained by Defendant through this inequitable conduct.

**SECOND CLAIM FOR RELIEF**
**Fraud**
**(By Plaintiff, Individually and on Behalf of the Nationwide Class, against Defendant)**

84. Plaintiff repeats and incorporates the paragraphs above as though fully set forth herein.

85. Plaintiff brings this claim individually and on behalf of the members of the Nationwide Class against Defendant under New Jersey common law.

86. As alleged above, Defendant made false and misleading statements, and omitted material facts, in representing to Plaintiff and the members of the Nationwide Class that the Subject Products contained thread counts of 1000 or greater.

87. The actual thread counts of the Subject Products that Plaintiff and the members of the Nationwide Class purchased were far less than the thread counts Defendant represented on the labeling and packaging of such products and in materials used to advertise and market such products from New Jersey.

88. Defendant also failed to disclose that such products did not, in fact, contain the thread counts represented on the labeling and packaging, and in advertisements and promotional materials for the Subject Products.

89. Defendant knowingly and intentionally misrepresented the thread counts of the Subject Products for the purpose of increasing its revenues and maximizing its corporate profits, which were retained in New Jersey.

90. Defendant made these misrepresentations and omissions with knowledge of their falsehood.

91. Defendant's misrepresentations and omissions concerning the thread counts of Subject Products were intended to induce Plaintiff and the members of the Nationwide Class to purchase such products.

92. And, as intended, Defendant's misrepresentations and omissions concerning the thread counts of the Subject Products induced Plaintiff and the members of the Nationwide Class to purchase such products. In purchasing the Subject Products, Plaintiff and the members of the Nationwide Class reasonably and justifiably relied on Defendant's misrepresentations and omissions concerning the thread counts of such products.

93. Had Plaintiff and the members of the Nationwide Class known that the Subject Products they purchased contained thread counts materially lower than the thread counts represented by Defendant on the Subject Products' labeling and packaging, they either would not have purchased such products at all or would have paid significantly less for such products.

94. The fraudulent actions by Defendant were orchestrated from New Jersey, as alleged herein, causing substantial harm to Plaintiff and the members of the Nationwide Class, entitling them to punitive damages as the sole remedy on this count.

**THIRD CLAIM FOR RELIEF**
**Violation of New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8, *et seq.***
**(By Plaintiff, Individually and on Behalf of the Nationwide Class, Against Defendant)**

95. Plaintiff repeats and incorporates the paragraphs above as though fully set forth herein.

96. Plaintiff brings this claim individually and on behalf of the members of the Nationwide Class against Defendant under New Jersey's Consumer Fraud Act ("NJCFA"), N.J. Stat. Ann. § 56:8, *et seq.*

97. The NJCFA provides that:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

N.J. Stat. Ann. § 56:8–2.

98. The NJCFA further provides that:

> The advertisement of merchandise as part of a plan or scheme not to sell the item or service so advertised or not to sell the same at the advertised price is an unlawful practice and a violation of the act to which this act is a supplement.

N.J. Stat. Ann. § 56:8–2-2.

99. Defendant's conduct, as alleged herein—and specifically including but not limited to falsely representing thread counts on the Subject Products it manufacturers and markets—constitutes unconscionable commercial practices, deception, fraud, false pretenses, false promises, misrepresentation within the meaning of the NJCFA.

100. Defendant's conduct, as alleged herein—and specifically including but not limited to falsely representing thread counts on the Subject Products it manufacturers and markets—constitutes the knowing, concealment, suppression, or omission of material fact with intent that

others rely upon them in violation of the NJCFA.

101. Plaintiff and the members of the Nationwide class relied upon Defendant's false representations and omissions regarding the thread counts on the Subject Products it manufacturers and markets, and would not have purchased those items had the known their true thread counts, or would not have the price they paid had they known their true thread counts.

102. As a result of Defendant's unlawful practices, as alleged herein, Plaintiff and each member of the Nationwide Class has suffered ascertainable monetary harm in the form of monies spent on the Subject Products which they would not have spent but for the false representations and omission concerning those products' thread counts, in amounts to be proven at trial.

103. Plaintiff and each member of the Nationwide Class has suffered ascertainable monetary harm directly traceable to Defendant's false representations and omission concerning the Subject Products' thread counts.

104. Unless restrained and enjoined, Defendant will continue to engage in the above-described conduct. Accordingly, injunctive relief is appropriate to protect Plaintiff and the other Nationwide Class members from Defendant's unlawful practices, as alleged above.

105. To redress Defendant's violations of the NJCFA, Plaintiff, individually and on behalf of the members of the Nationwide Class, seeks an order enjoining Defendant's unlawful practices, and awarding actual damages, punitive damages, and any other just and proper relief available under the NJCFA.

**FOURTH CLAIM FOR RELIEF**
**Violation of Oklahoma Consumer Protection Act, Okla. Stat. Tit. 15 § 751, *et seq.***
**(By Plaintiff, Individually and on Behalf of the Oklahoma Subclass, Against Defendant)**

106. Plaintiff repeats and incorporates the paragraphs above as though fully set forth herein.

107. Plaintiff brings this claim individually and on behalf of the members of the Oklahoma Subclass against Defendant under Oklahoma's Consumer Protection Act ("OCPA"), Okla. Stat. Tit. 15 § 751, *et seq*.

108. The OCPA prohibits conduct that falls within 33 categories of unlawful practices. Okla. Stat. Tit. 15 § 753.

109. Defendant's conduct, as alleged herein, constitutes unlawful practices in violation of the OCPA.

110. Defendant's conduct, as alleged herein, constituted "unlawful practice" because, as alleged above, Defendant manufactured, packaged, labeled, advertised, promoted, and marketed the Subject Products with inflated thread counts that were far greater than the thread counts that such products actually contained. In doing so, Defendant knowingly made a false representation regarding the make, characteristics, and benefits of the Subject Products—the products were of 1000 thread count when their thread counts were actually 474—thereby offending an established public policy and engaging in immoral, unethical, oppressive, and/or unscrupulous activities that were substantially injurious to consumers. Okla. Stat. Tit. 15 § 753 (1), (5).

111. Defendant's misrepresentations regarding the Subject Products' thread counts, as alleged herein, also constituted "unlawful practices" in violation of the OCPA because knowingly making such misrepresentations regarding the "particular standard" the Subject Products were represented to meet, as Defendant did here, was likely to deceive reasonable consumers and the public into believing the Subject Products (including those sold to Plaintiff and the Oklahoma Subclass members) contained higher thread counts than they actually had—and as result were of better quality, durability, longevity, softness, and sleep-ability than other alternatives. Okla. Stat. Tit. 15 § 753 (8). A reasonable consumer cannot determine the truth concerning these

representations without conducting destructive and hyper-technical testing, which is not something that can be performed by an ordinary consumer.

112. These representations were materially false, deceptive, and misleading, as described herein.

113. Had Plaintiff and the Oklahoma Subclass known that the Subject Products contained thread counts materially lower than the thread counts represented by Defendant on the packaging and labeling of such products, they either would not have purchased such products at all or would have paid significantly less for such products.

114. As a result of Defendant's unlawful practices, as alleged herein, Plaintiff and each member of the Oklahoma Subclass has suffered monetary harm, in amounts to be proven at trial.

115. Unless restrained and enjoined, Defendant will continue to engage in the above-described conduct. Accordingly, injunctive relief is appropriate to protect Plaintiff and the other Oklahoma Subclass members from Defendant's unlawful practices, as alleged above.

116. To redress Defendant's violations of Okla. Stat. Tit. 15 § 753, Plaintiff, individually and on behalf of the members of the Oklahoma Subclass, seeks an order enjoining Defendant's unlawful practices, and awarding actual damages and any other just and proper relief available under the OCPA. *See* Okla. Stat. Tit. 15 § 761.1.

**FIFTH CLAIM FOR RELIEF**
**Negligent Misrepresentation**
**(By Plaintiff, Individually and on Behalf of the Oklahoma Subclass, against Defendant)**

117. Plaintiff repeats and incorporates the paragrpahs above as though fully set forth herein.

118. Plaintiff brings this claim individually and on behalf of the members of the Oklahoma Subclass against Defendant under Oklahoma common law.

119. Defendant misrepresented a fact. It advertised the Subject Products as containing thread counts of 1000 or greater, when in fact the actual thread counts of these products are approximately 50% lower than represented.

120. There were no reasonable grounds for Defendant to believe that these misrepresentations were true. As an experienced bedding and linen manufacturer responsible for testing the products that it labels, packages, advertises, promotes, and markets, Defendant either knew or should have known that the Subject Products did not in fact contain thread counts of 1000 or greater.

121. These misrepresentations were material. Consumers purchase bedding and linen products with higher thread counts based on their superior quality, durability, longevity, and softness. Accordingly, the thread counts as advertised on the Subject Products were a material—if not the sole—factor in Plaintiff's decision to purchase the Subject Products. And this would be true of any reasonable consumer, including members of the Oklahoma Subclass.

122. Defendant intended that consumers, like Plaintiff and the Oklahoma Subclass members, rely on its representation that the Subject Products contained thread counts of 1000 or greater, as stated on the labels of the Subject Products and in advertising, marketing, and promotional materials for the Subject Products. As alleged herein, that representation was designed solely for consumers, like Plaintiff and the Oklahoma Subclass members, who will ultimately purchase and use the Subject Products in their homes.

123. Plaintiff's reliance on Defendant's representation that the Subject Products contained thread counts of 1000 or greater was justifiable. Plaintiff had no way of verifying this representation before purchase, and consumers generally rely on the thread count stated on Subject Products instead of paying the substantial costs to have the product tested by a lab.

124. Plaintiff was proximately damaged by Defendant's misrepresentations. Had Plaintiff known that Defendant's representations that the Subject Products contained thread counts of 1000 or greater were false, Plaintiff would not have paid as much as they did for the Subject Products, or they would not have purchased such products at all.

125. Further, Defendant was in a "special relationship" with Plaintiff and the Oklahoma Subclass members, and thus owed them a duty of care because:

a) The thread count misrepresentations Defendant made on the Subject Products' labels and packaging and in advertising and promotional materials for the Subject Products were intended solely to affect the purchasing decisions of consumers, like Plaintiff and Oklahoma Subclass members, who will ultimately base their decision on these thread count claims and who ultimately use the Subject Products in their homes.

b) It was foreseeable that, by misrepresenting a thread count as being higher than it is, and charging a premium for that added quality, Defendant would economically harm consumers by misleading them into paying an unjustified premium for bedding and linen products that lacked the represented quality.

c) This harm was certain.

d) Defendant's decision to label, package, and advertise, market, and promote the Subject Products as containing thread counts of 1000 or greater was the close, proximate cause of Plaintiff's and Oklahoma Subclass members' deception and the fact that they were overcharged for the Subject Products.

e) Misrepresenting the thread count on bedding and linen products is egregious and immoral for several reasons, the most obvious being that it leaves consumers vulnerable to poor sleep quality and heightens their risk for other discomfort. Charging a steep premium for a product that is inferior in quality, durability, longevity, softness, and sleep-ability immorally deprives these consumers of money that they could have spent on more useful, necessary items.

f) Holding bedding and linen manufacturers accountable—to Plaintiff and Oklahoma Subclass members—for thread count misrepresentations would deter future misrepresentations, with no perceivable drawbacks.

126. Accordingly, Plaintiff seeks damages on behalf of herself and the Oklahoma Subclass members in the amount of the overcharges they paid for the Subject Products.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of all others similarly situated, seeks a judgment against Defendant as follows:

A. For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Classes and Plaintiff's attorney as Class Counsel to represent the Classes;

B. For an order finding in favor of Plaintiff and the Classes and against Defendant on all counts asserted herein;

C. For actual, compensatory, and/or punitive damages in amounts to be determined by the Court and/or jury;

D. For prejudgment interest on all amounts awarded;

E. For an order of restitution and all other forms of equitable monetary relief;

F. For injunctive relief as pleaded or as the Court may deem proper;

G. For an order awarding punitive damages, reasonable attorneys' fees, and costs to counsel for Plaintiff and the Classes; and

H. For an order of any other equitable or other relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated: June 9, 2026 Respectfully submitted,

/s/ Philip L. Fraietta

**BURSOR & FISHER, P.A.**
Philip L. Fraietta
50 Main Street Suite 475
White Plains, NY 10606
Telephone: (914) 874-0710
Facsimile: (212) 989-9163
E-mail: pfraietta@bursor.com

Frank S. Hedin*
**HEDIN LLP**
1395 Brickell Ave., Suite 610
Miami, Florida 33131-3302
Telephone: (305) 357-2107
Facsimile: (305) 200-8801
fhedin@hedinllp.com

*Counsel for Plaintiff and Putative Classes*

**Pro Hac Vice application forthcoming*